UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

EXPERT OIL & GAS, LLC                          CIVIL ACTION

VERSUS                                         NO: 22-3121

HDI GLOBAL SPECIALTY SE ET AL.                 SECTION "H"

## ORDER AND REASONS

Before the Court are Plaintiff's Motion for Summary Judgment (Doc. 31) and Defendants' Motion for Partial Summary Judgment (Doc. 33). For the following reasons, the Motions are **GRANTED IN PART.**

## BACKGROUND

Plaintiff ExPert Oil & Gas, LLC owns a hydrocarbon production processing facility in Lake Salvador, Louisiana. The property was damaged as a result of Hurricane Ida, a Category 4 storm. Plaintiff is the named insured on a Marine Cargo and Equipment Insurance Policy issued by Defendants Hdi Global Specialty Se, American International Group UK Limited, and Renaissance Re Syndicate 1458, which provided coverage to Plaintiff's property at the time of the storm ("the Policy"). Plaintiff alleges that despite producing a satisfactory proof of claim, proving $4,415,341.01 in damages to its facility, Defendants have only made two payments totaling $392,038.27.

1

Plaintiff filed this action seeking the remaining proceeds for its property damage, consequential damages, and bad faith penalties.

Plaintiff and Defendants have each moved for summary judgment on the issue of coverage. Plaintiff seeks a judgment finding that the Policy provides blanket insurance coverage up to the Policy limits and entitles it to a damages award of $3,318,733. Defendants seek a judgment stating that (1) the Policy is a scheduled policy; (2) damages for the barge moored to the Lake Salvador platform at the time of the subject loss are specifically excluded; and (3) the only potential coverage afforded by the Policy for any unscheduled items is limited to the Policy's coverage extensions.  The Court will consider each issue in turn.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1]  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[3]  "If the moving party meets the initial

---

[1] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[2] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[3] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).

burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[4]  Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[5]  "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[6] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[7]  Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[8]

## LAW AND ANALYSIS

### A. Coverage

The parties primarily dispute whether the Policy is a blanket policy or a scheduled policy.

> A scheduled policy is one in which "each separately treated item of property is in effect covered by a separate contract of insurance and the amount recoverable with respect to a loss affecting such property is determined independently of the other items of

---

[4] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).

[5] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[6] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[7] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[8] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

property." 12 Couch on Ins. § 175.90. A blanket policy, on the other hand, is one in which coverage "attaches to, and covers to its full amount, every item of property described in it." *Id.* § 177.72.[9]

Plaintiff contends that the Policy is a blanket policy that provides $2,500,000 in coverage for damage caused by a Category 4 or 5 named windstorm. It contends that although the Policy includes a list and estimated value of property located at the facility, coverage is not restricted to those specific items or their value and the list was simply used to calculate the policy premium. On the other hand, Defendants contend that the Policy provides for a $2,500,000 coverage limit for the scheduled equipment listed in the Policy damaged as a result of a Category 4 or 5 named windstorms.

"Under Louisiana law, an insurance policy is a contract between the parties and should be interpreted according to the general rules of interpretation of contracts prescribed in the Louisiana Civil Code."[10]  Further, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties'

---

[9] Rainbow USA, Inc. v. Crum & Forster Specialty Ins. Co., 711 F. Supp. 2d 655, 665 (E.D. La. 2010).

[10] *Smith v. Am. Family Life Assur. Co. of Columbus*, 584 F.3d 212, 215–16 (5th Cir. 2009).

intent."[11]  "Generally, courts look at the language of an insurance policy as a whole to determine whether it provides for scheduled or blanket coverage."[12]

    *1. The Policy*

In order to consider the plain meaning of the Policy, the Court will outline the relevant portions here. The relevant Risk Details as outlined on the MRC Slip provide:

> INTEREST: Equipment of any nature whilst in use, whilst in store or at rest and whilst in transit, being the property of the Insured (owned, leased/rented in or out) or for which is under the care, custody and control of the Insured or for which the Insured may be legally liable.
>
> SUM INSURED: Total Insured Values USD 3,643,084 as per schedule attached however limited to USD 2,500,000 combined single limit in regards to Named Windstorm (Categories 4 and 5 only).
>
> DEDUCTIBLE: USD 50,000 any one occurrence but USD 100,000 any one occurrence in respect of Named Windstorm (Categories 4 and 5 only - Categories 1, 2 & 3 not covered hereunder).[13]

The "Information" section of the MSC Slip provides that "Scheduled equipment is located on Lake Salvador, 25 miles South East of New Orleans. Water depth is approximately 10' and underlying structure is a concrete 'Waskey' platform

---

[11] *Id.*

[12] *Rainbow USA, Inc.*, 711 F. Supp. 2d at 665.

[13] Doc. 31-2 at 1.

5

of substantial height above the water with 22' concrete pilings."[14] The "Conditions" section describes the "Basis of Valuation" as "Agreed Value."[15]

The second document comprising the Policy is entitled "ExPert Oil & Gas LLC 2021-2022 Property Values."[16] It provides a list of ExPert Lake Salvador Facility Topside Equipment that includes the type, number, and value of certain equipment located at the facility. The total value of the listed equipment is $3,643,084.[17]

The third document in the Policy is the RAP All Risks Equipment Form, which provides the general terms, conditions, limitations, and exclusions of the Policy. The pertinent provisions thereof include:

1.   COVERAGE
     This policy insures against all risks of physical loss of or physical damage to the property insured from any cause and similar coverages related thereto, except as may be hereinafter provided.

2.   DEFINITION OF PROPERTY INSURED
     Exploration, production and/or development mobile property of any description including but not limited to workover rigs, well servicing rigs, support/logistical/service equipment, oil and gas lease property, tools, pumps, oil or gas gathering systems production/ disposal/processing facilities, real and personal property, electronic data processing equipment, compressor stations, tankage, materials, machinery, in use, in transit, in storage or otherwise that are owned or operated by the Insured or in which the Insured has an interest or for which the Insured has assumed liability, in whole or in part, also Including equipment of contractors or others (if at the

---

[14] *Id.* at 4.
[15] *Id.* at 1.
[16] *Id.* at 7.
[17] *Id.*

risk of the Insured) including but not limited to miscellaneous and/or unscheduled property leased or rented in or out by Insured but at a value not exceeding that specified by the lease agreement. . . .

16.   NEW ACQUISITIONS/ AUTOMATIC COVERAGE
      This policy/section, subject to its terms and conditions, is extended to cover additional property and/or increases in value which the Insured may acquire subsequent to the effective date and during the period of this policy. In consideration of this extension, the Insured specifically agrees to report such acquisition to the Insurers hereon within 90 days and pay pro rata additional premium from date acquired to expiration. This policy shall cease to cover any equipment so acquired if not reported with the required period. In no event shall the insurers heron be liable for more than 25% of the scheduled values of the terms of this extension. . . .

23.   BASIS OF VALUATION
      Agreed Value: The cost agreed at inception of the policy between the Insured and Insurers as the amount to be paid in the event of a total loss of the item(s) insured (without regard to the Actual Cash Value or Replacement Cash Value).[18]

The RAP All Risks Equipment Form also includes a detailed list of property and perils *not* covered by the Policy.

   *2.  Plaintiff's Argument*

   Plaintiff argues that the "Interest" section of the MRC slip and Section 2 of the RAP All Risks Equipment Form provide for blanket coverage and that the Policy does not contain a single provision that states that it is a "scheduled

---

[18] *Id.* at 8–15.

policy" or that coverage is limited to the property that is listed on the list that was attached to the Policy. It argues therefore that the Policy unambiguously provides for blanket coverage.

In support, Plaintiff cites to *Reliance Insurance Co. v. Orleans Parish School Board*, in which the Fifth Circuit considered whether a fire insurance policy provided blanket or scheduled coverage.[19] There, the Fifth Circuit found that the policy provided blanket coverage despite containing an attached list of property and statement of values.[20] It noted that the policy contained a special form entitled "School Form-Blanket," and all of the experts agreed that "the first six pages of the policy indicate that the policy here is a blanket policy."[21] The defendant argued, however, that the list of properties and its values, in addition to the endorsements, which either deleted or added property and specified the value of the property, were inconsistent with a blanket policy.[22] The court found otherwise, holding that the frequent addition and deletion of properties to the policy without a change in premium was consistent with a blanket policy and the policy's co-insurance clause, which required the plaintiff to maintain insurance on each item of property insured of not less than 90% of the actual cash value.[23] It also noted that the value assigned to each listed property was the full value of each building, not the amounts of insurance coverage afforded by the fifty percent policy at issue.[24] Plaintiff

---

[19] Reliance Insurance Co. v. Orleans Parish School Board, 322 F.2d 803, 804 (5th Cir. 1963).
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

contends that *Reliance* stands for the proposition that the attachment of a list of property and its value to a policy does not change the classification of the policy from a blanket policy to a scheduled policy without a provision that specifically restricts coverage to the property listed on the list.

### 3. Defendants' Argument

On the other hand, Defendants argue that the Policy should be considered as a whole and that there are numerous references to the attached schedule in the Policy. Indeed, the word "schedule" appears at least 12 times in the Policy. Specifically, the sum insured is expressly limited to $3,643,084 "as per schedule attached," and $3,643,0884 is the sum total of each individually scheduled piece of equipment in the list attached to the Policy. Further, the Policy twice states that the basis of valuation is the "agreed value."

For their part, Defendants rely on *Fair Grounds Corp. v. Travelers Indem. Co. of Illinois* in which the Louisiana Fifth Circuit Court of Appeal held that "references to 'statements of values on file with us'" in a policy meant that it was a scheduled, rather than blanket, policy.[25] Similarly, the Louisiana Fourth Circuit Court of Appeal found in *Orleans Parish School Board v. Lexington Insurance Co.* that the policy was scheduled where it contained language limiting coverage to "the total stated amount for the property involved, as shown on the latest Statement of Values on file with the Company."[26] In *Beazley Underwriting Ltd. v. DeQuincy Real Estate Holdings LLC*, the Western District Court of Louisiana found that a policy that stated

---

[25] 742 So. 2d 1069, 1072 (La. App. 5 Cir. 1999).
[26] Orleans Par. Sch. Bd. v. Lexington Ins. Co., 99 So. 3d 723, 728 (La. App. 4 Cir. 2012).

"[a]s per Schedule on file with the Underwriter" unambiguously provided for scheduled coverage.[27] Another section of that court similarly found in *Forest Oaks Shreveport Apartments, LLC v. Western World Insurance Co.* that references to a statement of value on file with the company "coupled with a limit of liability endorsement signal that the insurance contract is a scheduled policy."[28]

### 4. Analysis

This Court does not find any case cited by either party to be particularly helpful in considering the language of the Policy at issue. The Policy here is easily distinguishable from the one considered in *Reliance*, where it does not use the word "blanket" and does not contain a co-insurance provision. While this Court agrees with the proposition that the attachment of a list of property and its value to a policy does not change the classification of the policy from a blanket policy to a scheduled policy without a provision that specifically restricts coverage to the property on the list, it is unclear whether such a provision exists here. The language at issue here is far more ambiguous than that considered by the courts in the cases cited by Defendants. Despite multiple uses of the word "scheduled," the Policy here does not reference a "statement of value on file with the company" or contain a provision expressly limiting liability thereto.

Accordingly, this Court finds the policy at issue to be ambiguous as to whether it provides for blanket or scheduled coverage. Under Louisiana law,

---

[27] Beazley Underwriting Ltd. v. DeQuincy Real Est. Holdings LLC, No. 2:21-CV-01884, 2021 WL 4134431, at *2 (W.D. La. Sept. 10, 2021).

[28] Forest Oaks Shreveport Apartments, LLC v. W. World Ins. Co., No. CV 20-286, 2021 WL 2534112, at *4 (W.D. La. June 21, 2021).

"an insurance contract is ambiguous if it is susceptible to two or more reasonable interpretations or if the intent of the parties cannot be ascertained from the language employed."[29] Here, "the interpretation of the policy language urged by plaintiff can only be adopted by reading out" all of the many uses of the term "scheduled" and the provision stating that the basis of valuation is the "agreed value."[30]   On the other hand, Defendant's interpretation requires the Court to ignore the inclusive description of the property insured by the Policy and would render meaningless the Policy's detailed list of items that are not covered. "One provision of the contract should not be construed separately at the expense of disregarding other provisions."[31]

"Where a contract provision is ambiguous, it should be interpreted in light of the custom and usages of the industry, as well as the conduct of the parties and any prior agreements between them."[32] "[O]nce the Court has determined that the contract is ambiguous, interpreting the agreement from the words of the contract and extrinsic evidence is a task for the trier of fact."[33] "[I]f, after applying the general rules of contractual interpretation to an insurance contract, an ambiguity remains, the ambiguous contractual provision is generally construed against the insurer and in favor of coverage."[34]

In opposition to summary judgment on the issue of coverage, Defendants offer extrinsic evidence involving coverage under Plaintiff's other insurance

---

[29] Six Flags, Inc. v. Westchester Surplus Lines Ins. Co., 565 F.3d 948, 955 (5th Cir. 2009).

[30] Sims v. Mulhearn Funeral Home, Inc., 2007-0054, 956 So. 2d 583, 589 (La. 2007).

[31] *Id.*

[32] *Rainbow USA, Inc*, 711 F. Supp. 2d at 667.

[33] *Id.*

[34] *Sims*, 956 So. 2d at 589–90.

policies. Defendants contend that Plaintiff has a gap in coverage that it is attempting to fill by construing the Policy at issue to provide blanket coverage. They also argue that Plaintiff has failed to comply with its discovery obligations regarding disclosures of claims made or amounts paid under other policies. For its part, Plaintiff submits evidence that its representatives believed that it was purchasing a policy that provided blanket coverage. It alleges that it did not receive a copy of the Policy and was not aware that the "Property Values spreadsheet that was requested by the insurance broker was referenced by or attached to the Policy" until after the loss at issue here.[35] Defendants dispute this fact. Accordingly, this Court finds that there are material issues of fact regarding the extrinsic evidence necessary for the trier of fact to interpret the parties' intent and determine whether the Policy provides scheduled or blanket coverage.

### B. Coverage Extensions

Plaintiff also argues that the Policy provides additional coverage beyond the $2,500,000 through coverage extensions. Plaintiff contends that the Policy provides for an additional $300,000 in coverage for (1) Miscellaneous and/or Unscheduled Property; (2) Extra and Expediting Expenses; and (3) Pollutant Clean Up and Removal. It also contends that it is entitled to additional coverage in the amount of $910,771 for the removal of wreckage and debris.

While Defendants do not dispute that the Policy provides for certain additional coverage, they argue that Plaintiff has not presented any evidence of its entitlement to those amounts. This Court agrees that Plaintiff's Motion

---

[35] Doc. 34.

does not provide proof of entitlement to these amounts, and therefore summary judgment on these coverage categories is inappropriate.

As to the Policy's coverage for removal of wreckage and debris, the Policy provides that coverage is extended to "all costs and expenses of or incidental to the raising, removal or destruction of the wreckage and/or debris *of the property insured hereunder*."[36] Accordingly, a decision on what property is insured by the Policy is required to determine the Policy's coverage for removal of wreckage and debris. Accordingly, summary judgment likewise cannot be entered on this issue.

### C. Deductible

Next, Plaintiff seeks a judgment that no deductible is required for its claim. The Policy unequivocally states that the deductible for a Category 4 or 5 wind storm is $100,000. However, Plaintiff points to another provision of the Policy that states that "[t]he deductible/retention shall not apply in the event of actual or constructive total loss of any item forming part of the Schedule of Insured's Assets."[37] Plaintiff argues that because items listed in the property list attached to the Policy, such as the drain sump tank, were total losses, then no deductible applies. Defendants rebut that such an interpretation leads to absurd results wherein the total loss of a low-value item would obviate the entire deductible. Even so, Defendants do not offer a contrary interpretation of the provision. By its plain terms, the Policy provides that no deductible applies if *any* item in the schedule of assets is a total loss. Accordingly, the Court agrees with Plaintiff that according to the clear terms of the Policy, no

---

[36] Doc. 31-2 at 13.
[37] *Id.* at 12.

deductible is due on its claim if an item from the schedule of assets is a total loss.

### D. Watercraft Exclusion

Finally, Defendants asks the Court to find that the Policy does not provide coverage for a barge moored to the Lake Salvador platform. It is undisputed that the barge is not on the list of property attached to the Policy. That said, Defendants argue that the barge is not covered for an additional reason: the Policy expressly excludes coverage for watercraft. Indeed, the Policy states that it excludes coverage for "watercraft, unless forming part of scheduled equipment as advised to and agreed by Slip Leader at attachment of risk."[38] Plaintiff rebuts that the barge at issue is no longer considered a "watercraft" because at the time of the loss it "was permanently affixed adjacent to the Platform, had been permanently removed from navigation, and was no longer capable of operating as a vessel."[39] In support, Plaintiff discusses case law regarding when a barge that is used as a work platform is no longer considered a "vessel" under maritime law. Defendants point out that these cases are not dispositive in considering whether the barge here is a "watercraft" under the terms of the Policy. The Policy, however, does not define the term "watercraft." Under Louisiana law, the words of a contract should be given "their common and usual significance."[40]

The Supreme Court's discussion in *Lozman v. City of Riviera Beach, Florida* is helpful in considering the meaning of the term "watercraft."[41] There,

---

[38] *Id.* at 7.
[39] Doc. 34.
[40] Gambel v. Tullis, 307 F. Supp. 3d 570, 575 (E.D. La. 2018).
[41] Lozman v. City of Riviera Beach, Florida, 568 U.S. 115, 123 (2013).

the Court considered whether a floating home was a "vessel" under 1 U.S.C. § 3, which states that "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." In so discussing, the Supreme Court explained that the term "craft" means a vessel for the purpose of "water carriage and transport."[42] And "[t]he addition of the word 'water' to 'craft,' yielding the term 'watercraft,' emphasizes the point."[43] Similarly, the Oxford English Dictionary defines "watercraft" as "[a] boat or other vessel designed for use on water."[44] Accordingly, "it cannot be reasonably questioned that a watercraft is a craft for use in or on water."[45]

Here, Plaintiff has presented the following undisputed facts regarding the barge at issue.

> [Plaintiff] ExPert purchased a 10,000-barrel oil storage barge and permanently affixed the barge adjacent to the Platform. This oil storage barge was installed adjacent to the Platform to serve as a permanent storage tank. Once the oil storage barge was brought on-site, it was permanently moored on location by driving pilings on all four sides of the barge, effectively pinning it on location as it had permanent pilings on every side prohibiting its movement. The oil storage barge was effectively placed inside an immovable cage where it was able to float up and down with the tide but was prohibited from significant lateral movement, navigation, or transportation. A permanent walkway was then installed that ran from the Platform to the oil storage barge. Permanent load lines were also installed that ran from the Platform to the oil storage barge. These load lines transferred

---

[42] *Id.*

[43] *Id.*

[44] *Watercraft*, OXFORD ENGLISH DICTIONARY (July 2023).

[45] First Specialty Ins. Corp. v. Am. Home Assur. Co., 558 F.3d 97, 100 (1st Cir. 2009).

processed hydrocarbons from the Platform to the oil storage barge for storage.

 The ExPert Platform processes the hydrocarbons as it did prior to the loss of the pipeline and then transfers the product into the oil storage barge. Once the oil storage barge becomes full, a tug and oil transportation barge operated by either Plains All American or Settoon Towing is sent to the oil storage barge and the stored product is pumped out of the oil storage barge and into the oil transportation barge and taken to shore. . . .

 The oil storage barge remained permanently affixed adjacent to the Platform from April 2019 until Hurricane Ida. During Hurricane Ida, the wind and storm surge caused the pilings to be torn from the seabed, the barge broke free from the permanent enclosure, the permanently affixed load lines were broken, and the barge was carried miles away by the storm.[46]

In *First Specialty Ins. Corp. v. American Home Assurance Co.*, the First Circuit Court of Appeals considered whether a barge that was being used as a floating work platform for marine construction projects was a "watercraft" pursuant to an insurance policy's watercraft exclusion.[47] The barge at issue traveled through water to arrive where it was needed, but had no means of propulsion or steering.[48]  The court held that under the "plain and commonly accepted" definition of "watercraft" the work barge at issue, "which is a vessel for use in the water, and which moved across water to reach its destination, was a watercraft."[49]

Here too, the barge at issue meets the "plain and commonly accepted" definition of "watercraft." Although it was affixed to the side of the platform

---

[46] *Id.*
[47] *Id.* at 99.
[48] *Id.*
[49] *Id.* at 100.

and not being used for transportation, it was clearly still capable of such as evidenced by its floating several miles away during Hurricane Ida. Indeed, even while affixed to the platform, the barge was floating in the water. While "a work-barge is not used in the same way as most other watercraft, . . . it is nonetheless clearly within the meaning of 'watercraft' contemplated by the insurance policy."[50] Accordingly, coverage for the barge is excluded by the Policy's watercraft exclusion. Defendants are entitled to a judgment stating that damages for the barge moored to the Lake Salvador platform at the time of the loss are specifically excluded.

## CONCLUSION

For the foregoing reasons, the Motions are **GRANTED IN PART**. Plaintiff is entitled to a finding that no deductible is required under the Policy; and Defendants are entitled to a finding that damages for the barge moored to the Lake Salvador platform at the time of the loss are specifically excluded. Summary judgment on all other issues is denied.

New Orleans, Louisiana this 17th day of October, 2024.

_____

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[50] Pennsylvania Nat. Mut. Cas. Ins. Co. v. S. State, Inc., No. CIV. 07-2989 (RMB), 2008 WL 5116207, at *7 (D.N.J. Dec. 3, 2008).